# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

---

## No. 16-3410

---

## THOM PARSON

### Plaintiff/Appellant,

### v.

## THE VANGUARD GROUP

### Defendant/Appellee.

---

## BRIEF OF APPELLANT AND VOLUME ONE OF APPENDIX
### (Pages 1a. to 20a.)

---

An Appeal from the Order of Judgment entered
in the United States District Court
for the Eastern District of Pennsylvania
on July 18, 2016 at Civil Action No. 15-3942

---

Timothy M. Kolman, Esquire
Wayne A. Ely, Esquire
414 Hulmeville Avenue
Penndel, PA 19047
(215) 750-3134
Attorneys for Appellant

## TABLE OF CONTENTS

Table of Authorities ........................................................................... ii.

I.    JURISDICTIONAL STATEMENT ................................ 1.

    a.    Basis for District Court's Jurisdiction ................ 1.

    b.    Basis for Court of Appeals' Jurisdiction ........... 1.

    c.    Timeliness of Appeal ......................................... 1.

    d.    Finality ............................................................... 2.

II.    STATEMENT OF
    RELATED CASES AND PROCEEDINGS ................. 3.

III.    STATEMENT OF ISSUES
    PRESENTED FOR REVIEW ..................................... 4.

IV.    SUMMARY OF ARGUMENT ................................... 5.

V.    STATEMENT OF THE CASE .................................. 6.

    a.    Procedural History ............................................. 6.

    b.    Statement of Facts ............................................. 6.

VI.    ARGUMENT ........................................................... 14.

    a.    Standard of Review ........................................... 14.

    b.    The *Prima Facie* Case of Discrimination ......... 16.

    c.    The Issue of Pretext, and What the District
       Court Got Wrong ............................................... 17.

VII.    CONCLUSION ....................................................... 24.

Certifications ........................................................... Attached.

# TABLE OF AUTHORITIES

**Statutes/Rules**

28 U.S.C. § 1331                                                             1,2

28 U.S.C. § 1291                                                             1,2

Fed. R. App. P. 4                                                             1

Fed. R. Civ. P. 56                                                           14

**Case Authorities**

*Anderson v. Liberty Lobby, Inc.*

477 U.S. 242, 91 L. Ed. 2d 202, 106 S.Ct. 2505 (1986)                        15

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*

974 F.2d 1358 (3rd Cir. 1992),

*cert. denied,* 507 U.S. 912, 113 S. Ct. 1262 (1993)                         15

*Brosseau v. Haugen*

543 U.S. 194, 160 L.Ed. 2d 583, 125 S.Ct. 596 (2004)                         15

*Coolspring Stone Supply v. American States Life Ins. Co.*

10 F.3d 144 (3d Cir. 1993)                                                   14

*Eastman Kodak Co. v. Image Technological Services, Inc.*

504 U.S. 451, 119 L.Ed. 2d 265, 112 S.Ct. 2072 (1992)                        15

*Haugh v. Allstate Ins. Co.*

2003 U.S. App. LEXIS 3721 (3d Cir. February 28, 2003)                        14

*Howard v. Blalock Elec. Serv.,*

742 F. Supp. 2d 681(W.D. Pa. 2010)                                16

*Jalil v. Avdel Corp.*

873 F.2d 701 (3d Cir. 1989)                                       18

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*

475 U.S. 574, 89 L.Ed. 2d 538, 106 S. Ct. 1348 (1986)            15

*Meyers v. Hoboken Bd. Of Educ.*

2010 U.S. Dist. LEXIS 115712 (D.N.J. Oct. 29, 2010)              17

*Northview Motors, Inc. v. Chrysler Motors Corp.*

227 F.3d 78 (3rd Cir. 2000)                                      14

*Stewart v. Rutgers, State Univ.*

120 F.3d 426 (3d Cir. 1997)                                      16

*Walden v. St. Gobain Corp.*

323 F. Supp. 2d 637 (E.D. Pa. 2004)                            15, 16

---

# I.  JURISDICTIONAL STATEMENT

### a.    Basis for District Court's Jurisdiction

The United States District Court for the Eastern District of Pennsylvania properly exercised subject-matter jurisdiction over the instant matter pursuant to 28 U.S.C. § 1331 (Federal Question Jurisdiction) because the action arose under the laws of the United States (specifically, Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981).

### b.    Basis for Court of Appeals' Jurisdiction

The United States Court of Appeals for the Third Circuit may properly exercise jurisdiction over the instant appeal pursuant to 28 U.S.C. § 1291 (final decisions of District Courts) because the Order granting summary judgment and dismissing this action disposed of all claims of the parties and is therefore considered "final" and appealable for purposes of 28 U.S.C. § 1291.

### c.    Timeliness of Appeal

The instant appeal is timely because it was filed within thirty (30) days of the District Court's entry of summary judgment, as required by Fed. R. App. P. 4(a). Judgment was entered in favor of Defendant on July 18th, 2016. 26a, docket item 32.  The Notice of Appeal was timely filed on August 16th, 2016.  26a, docket item 33, *see also* 20a.

d.     **Finality**

The instant appeal is from a final order/judgment entering summary judgment and disposing of all the parties' claims. *See* 28 U.S.C. § 1291.

## II.    STATEMENT OF RELATED CASES AND PROCEEDINGS

There are no related cases or proceedings.

## III.   **STATEMENT OF ISSUES PRESENTED FOR REVIEW**

1.   Whether the District Court erred in entering summary judgment against Appellant on his claims of race discrimination under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981?

Suggested Answer:  Yes.

Pursuant to Third Circuit Local Appellate Rule 28.1(a)(1), Appellant asserts that this issue was preserved by Appellant's timely opposition to Appellee's motion for summary judgment and that no further preservation of this issue was necessary.

## IV.    SUMMARY OF ARGUMENT

The District Court erred in entering summary judgment against Plaintiff on his race discrimination claims under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.[1]    The Court correctly noted that the protected class, qualification, and adverse employment action elements of the *prima facie* case were undisputed, *see* 11a, and correctly determined that the sole *prima facie* element Defendant *did* dispute (the inference of discrimination) was also present because: (1) Plaintiff worked for over two decades (actually, 26 years) without issue and began having alleged performance "issues" only when Angela Rodden (a Caucasian who advised him that Defendant might not be the place for "his type") became his supervisor; (2) Plaintiff's performance was erroneously calculated on a computer system his managers had the ability to manipulate; and (3) Plaintiff's managers often called him "Willie" - the name of a *different* African-American employee – to his face. *Id.*  The District Court erred, however, in failing to utilize *the same evidence* to discredit Defendant's alleged reason for his termination (as the Third Circuit has authorized it to do, finding that summary judgment evidence need not be "compartmentalized" in discrimination cases).  The Court therefore erred in failing to find sufficient evidence of pretext in this matter and in entering summary judgment for Defendant.

---

[1] Plaintiff did not proceed on his hostile environment and retaliation claims, *see* 7a, n. 1.

## V.    **STATEMENT OF THE CASE**

### *a.    Procedural History*

Plaintiff/Appellant commenced this action by filing a Civil Action Complaint against Defendant/Appellee on July 16th, 2015.  22a, docket item 1. Defendant answered the Complaint (and also moved to dismiss it in part, addressing a disparate impact claim that was later dropped, *see* docket item 10). 22a, docket item no, 4.   After completion of discovery, on April 7th, 2016, Defendant filed a Motion for Summary Judgment and accompanying Brief. 24a, docket item 20. Plaintiff (after a brief extension of time) responded to the motion on May 12th, 2016.   24a, docket item no. 23. Defendant filed a reply with permission of the District Court on May 27th, 2016, 25a, docket item 25.  Plaintiff, also with permission of the Court, filed a sur-reply on June 9th, 2016. 25a, docket item 28.  Summary judgment was entered in favor of Defendant on July 18th, 2016. 26a, docket item 32.  The instant appeal followed.  26a, docket item no. 33.

### *b.    Statement of Pertinent Facts*

Plaintiff is African-American and was employed by Defendant for a period of *26 years* before being fired for "unsatisfactory performance," *see* 65a, paragraphs 1 and 3.  He worked from 1987 through May 12 of 2014.  *See* 65a, paragraph 3. Angela Rodden, a Caucasian female, was Plaintiff's direct supervisor from 2010 through mind-January of 2014. *See* 65a, paragraph 6. On two occasions, beginning

6

in June of 2013, Rodden made references to Defendant not being the place for "his type" of people.  In June of 2013, Plaintiff requested a meeting with Rodden to discuss time off that he required,  118a, (Plaintiff's deposition), pp. 96:18-19 and 97: 6-8.  At the end of the meeting, after discussing changes at the company, Rodden told Plaintiff " . . . Vanguard may not be the place for your type." 119a, p. 101:16.  Plaintiff took the remark to be a racial slur and testified that he " . . . couldn't believe . . ." Rodden made the statement. 119a, p. 101:23-24.  Rodden said nothing else after she made the foregoing statement.  120a, p. 102:14-15.

Rodden made an *identical statement* several meetings later, again advising Plaintiff that "Vanguard may not be the place for your type." 120a, p. 104:4-9. Asked what he believed Rodden meant when she referred to "his type," Plaintiff testified that, in 26 years with Defendant, Plaintiff observed firsthand that in the research department he worked in " . . . was either all white except for myself or predominantly white." 120a, p. 104:16-24 and 105 1-8.  Plaintiff was asked if he took the statement to refer to his race or age and responded "[t]hat's the only way I could take it, right." 120a, p. 105:19-20.  Asked what he though Rodden meant by "his type," he responded *"[b]lack."* 120a, p. 104:13 (emphasis added).  He also believed the remark was "[a] racist remark." 122a, p. 113:1.

Plaintiff also observed during his time at Defendant that of the 13 people he saw fired or forced out in the research department, " . . . 11 out of those 13 were black

. . .". 120a, p. 104:21-24 and p. 105:1-4. Most were fired due to alleged drops in productivity. *Id.*

In Plaintiff's 26 years with Defendant, the only instances of "poor performance" cited by Defendant are in 2012-2014 - and this alleged sudden drop in performance - after over two decades of good performance - came while Rodden was Plaintiff's direct supervisor. Defendant concedes that Rodden was Plaintiff's direct supervisor from 2010 through mid-January of 2014. *See* 65a, paragraph 6. She was therefore his direct supervisor (and directly involved in approving and/or issuing the following disciplines cited by Defendant to establish "poor performance" by Plaintiff):

> a.    at the time the performance appraisals of 2011, 2012 and 2013 were issued, all claiming he needed "further development." *See* 67a, paragraph 14;
>
> b.    at the time the "written Alert for Performance" dated February 8th, 2012 was issued. *See* 67a, paragraph 15;
>
> c.    at the time the "Written Alert for Absence, Lateness, or Dependability" was issued on February 14th, 2012. *See* 67a, paragraph 16;

8

d.    at the time the October 2013 "Written Alert for Performance" was issued. *See* 67a, paragraph 17;

e.    at the time the December 13th, 2013 "Formal Warning for Performance" was issued. *See* 67a, paragraph 18

The December 13th, 2013 "Formal Warning for Performance" was to remain in effect until March 13, 2014 (by which time Anthony Perilli was Plaintiff's supervisor). *See* 68a, paragraph 21.

Anthony Perilli is a Caucasian male and was Plaintiff's direct supervisor from mid-January 2014 until Plaintiff's termination. *See* 66a, paragraph 7. After Rodden's arrival, and continuing through Perilli's tenure, "every single one" of the supervisors Plaintiff encountered called him "Willie" (the name of another African-American employee, Willie Hubert) and called Mr. Hubert "Thom" [Plaintiff's name]. 123a, p. 117:22-24 and 124a, p. 118:1-5; *see also* 123a, p. 114:1 (setting forth Willie's name); and 123a, p. 117:1-10 ("[t]hey were calling me Willie. . . . And then they would see Willie and they would call him Thom"). Perilli participated in the foregoing conduct as well. 124a, p. 118: 4-5.

Perilli testified at his deposition that Rodden "introduced" Plaintiff's alleged performance issues at a "transition meeting" with her and Plaintiff before taking over as Plaintiff's supervisor. 227a, p. 17:14-19. Perilli testified he had gone back and examined Plaintiff's performance in past years and that he had had "good

9

reviews" under the supervisor who preceded Angela Rodden (Alex Peppernick). 231a, p. 34: 10-13.

Plaintiff's termination date was May 12th, 2014.   In January of 2014, Perilli began coming to Plaintiff asking why his productivity numbers (reported by the "Horizon" system, *supra*) were low, and Plaintiff began advising him the Horizon system was getting the numbers wrong.  Perilli's response was "I'll look into it." 156a, p. 247:18-24 and p. 248:1.  Perilli initially told Plaintiff the numbers being reported by the system were accurate.  156a, p. 248:11-13.  Perilli stated "[w]e checked into it, they're accurate."  *Id.*

As Defendant now concedes, this was simply not true, and it now admits the hours *were being doubled*.  Defendant has admitted "that Plaintiff's work hours were being doubled in the Horizon system."  This resulted in a normal work day of 7.50 hours being entered as 15 hours (*see* 35a, paragraph 71 of docket item 1 and 52a, paragraph 71 of docket item 4).  In other words, Plaintiff was being made to look half as productive as he actually was.  Defendant has admitted that the "Horizon" system had calculated Plaintiff's work week hours at 75 hours instead of 37.50 hours (*see* 36a, paragraph 73 of docket item 1 and 52a, paragraph 73 of docket item 4).

Additionally, Defendant also admitted in its Answer that Plaintiff's productivity rate, as reported on the "Horizon" system, declined from January 2013 to October

of 2013. *See* 34a, paragraph 57 of docket item 1 and 51a, paragraph 57 of docket item 4. Angela Rodden would have been Plaintiff's supervisor when the issue began and it continued under Perilli. The Horizon "inaccuracy" continued through February and April of 2014 (shortly before Plaintiff was terminated). *See* 215a and 217a.

Perilli told Plaintiff the productivity numbers reported by the "Horizon" system were " . . . a major part of my productivity and he would be having a conversation with HR and Nina [Matson] . . ." about disciplining Plaintiff. 159a, p. 261:13-19. Only later, when Plaintiff pointed out the numbers could not be correct, did this state of affairs change. 160a, p. 262:7-14. Plaintiff's belief is that " . . . [s]omebody in management manipulated my rates [in the Horizon system] . . . ." 160a, p. 264:13-14.

There is good reason to believe that this is exactly what occurred. Perilli agreed that the "problem" with the Horizon system was that Plaintiff's hours were in fact doubled from 7.5 to 15 in the system requiring Plaintiff to fill "twice as many hours" as he was required to work. 229a, p. 26:15-25. Perilli also testified that " . . . there were no issues when [Plaintiff] was reporting to Angela [Rodden]." 229a, p. 27:8-12. A "drastic decrease" in the numbers was later identified. *Id.* This is obviously not correct, as the issue had existed under Rodden as well, by

Defendant's own admission. *See* 34a, paragraph 57 of docket item 1 and 51a, paragraph 57 of docket item 4.

Perilli admitted he had the ability to enter the Horizon system and set crew schedules ("I have the ability . . ."). 230a, p. 29:6-11. Perilli testified that, when she was his supervisor, Angela Rodden would have also had the ability to enter the system and change schedules. 230a, p. 29:16-20. She would have lost access once Perilli became Plaintiff's supervisor. 230a, p. 29:14-15. Angela Rodden also herself testified she had the ability to make changes to schedules in the Horizon system. 248a, p. 9:1-8. Rodden does not recall if there were any inaccuracies in the manner in which the system reported Plaintiff's productivity during her tenure. 248a, p. 10:8-14. However, Defendant has admitted that there were. *See supra* 34a, paragraph 57 of docket item 1 and 51a, paragraph 57 of docket item 4.

Angela Rodden admitted that she could change the hours attributed to Plaintiff from 7.5 to 15 if she wanted to do so by creating a new schedule. 248a, p. 11:25 and p. 12:1-19. Perilli also testified he had the ability to log in and make alterations to crew schedules - and even create new ones. 232a, p. 38:10-14. Perilli testified that only he and the individuals in the support group could make alterations to the Horizon system's schedules. 232a, p. 40:2-7. Perilli worked with the support group to determine why the system was incorrectly reporting Plaintiff's

performance. 232a, p. 40:15-16. He worked with a single individual to determine what the issue was. 233a, p. 42:1-5.

Nina Matson-Thomas, a "Crew Relations" employee of Defendant, was present (along with Anthony Perilli and Plaintiff) at Plaintiff's termination meeting. *See* 69a, paragraph 23. She testified that Plaintiff's entire history of alleged "underperformance" [obviously including the write-ups under Angela Rodden's tenure as Plaintiff's supervisor] would have been considered as a basis to terminate him, not just one or two incidents near the end of his tenure. 268a, p. 49:6-25 and p. 50:1-6.

Plaintiff took the 30(b)(6) deposition of Defendant's designee, Michael C. Kerlin, on March 2, 2016. *See* Exhibit 7. The topics of the deposition (listed in the 30(b)(6) Notice appended to the transcript, *see* 302a) included (among others) the following:

> 3. The reason(s), if any were found, why the "Horizon" system did not accurately report information regarding Plaintiff's work productivity in 2013 or 2014.

> *See* 302a.

The 30(b)(6) deponent testified, on behalf of Defendant, that the reasons for the inaccurate reporting of Plaintiff's time originated in the "schedule side" of the system – which is controlled "indirectly" *by the supervisor.* 290a, p. 28:18-25 and 291a, p. 29:1. The 30(b)(6) deponent "couldn't say for sure" what caused the

problem. 291a, p. 31:1-12. The 30(b)(6) deponent agreed that the data entered into the system was "physically altered at some point." 291a, p. 31:13-17. The 30(b)(6) deponent testified he believed the problem was " ... most likely caused by some sort of a system glitch . . ." but when asked what the nature of the so-called "glitch" was, admitted he " . . . cannot say for sure." 293a, p. 39: 3-4 and 6-7.

No definitive explanation for the misreporting of Plaintiff's time on the system was ever offered by Defendant, and despite repeated questioning, none was ever offered by the 30(b)(6) designee.

## VI.    **ARGUMENT**

The District Court's Order granting summary judgment on Appellant's claims should be reversed. Because genuine issues of material fact remain to be decided by the jury in the instant case, the District Court erred in granting summary judgment for Defendant.

### *a.    Standard of Review*

The Court of Appeals exercises plenary review of district court orders granting summary judgment, applying a standard identical to that utilized by the district court under Fed. R. Civ. P. 56(c). *See, e.g., Haugh v. Allstate Ins. Co.,* 2003 U.S. App. LEXIS 3721, *8 (3rd Cir. February 28, 2003); *Northview Motors, Inc. v. Chrysler Motors Corp.,* 227 F.3d 78, 87-88 (3rd Cir. 2000).

Accordingly, the Court of Appeals can affirm a district court's grant of summary judgment only if it appears that "… there is no genuine issue as to any material fact …" and that the moving party "… is entitled to a judgment as a matter of law." *See* Fed. R. Civ. P. 56(c). Pursuant to Fed.R.Civ.P. 56(c) summary judgment is appropriate only in cases "… where there is no genuine issue of material fact for the jury to decide." *Coolspring Stone Supply v. American States Life Ins. Co.,* 10 F.3d 144, 148 (3rd Cir. 1993).

In responding to a motion for summary judgment, the nonmoving party (the Appellant in this case) must produce evidence demonstrating the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 91 L. Ed. 2d 202, 106 S.Ct. 2505 (1986). The burden always remains on the movant, however, to show that a rational trier of fact could not find for the non-moving party or parties and that there is therefore no genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 89 L.Ed. 2d 538, 106 S. Ct. 1348 (1986).

In ruling on a motion for summary judgment, the court must accept and believe the evidence of the non-movant as true, and must not weigh or consider the credibility of witnesses. *Anderson,* 477 U.S. at 248-52. The non-movant's evidence must be believed as true and any and all doubts must be resolved in that party's favor. *Eastman Kodak Co. v. Image Technological Services, Inc.,* 504 U.S.

451, 456, 119 L.Ed. 2d 265, 112 S.Ct. 2072, 2076 (1992).  On summary judgment, where the non-moving party's evidence contradicts the movant's evidence, then the non-movant's evidence must be taken as true. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3rd Cir. 1992), *cert. denied,* 507 U.S. 912, 113 S. Ct. 1262 (1993).  The court is also required to "view all facts and draw all reasonable inferences in favor of the nonmoving party." *Brosseau v. Haugen,* 543 U.S. 194, 195, 160 L.Ed. 2d 583, 125 S.Ct. 596, fn. 2 (2004).

This is an employment discrimination matter.  Courts have noted that "[i]n employment discrimination cases, the summary judgment standard is 'applied with added rigor' because 'intent and credibility are crucial issues.'" *Walden v. St. Gobain Corp.,* 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) *citing Stewart v. Rutgers, State Univ.,* 120 F.3d 426, 431 (3d Cir. 1997).

Rule 56 and the authorities interpreting it have set a very high standard for the granting of summary judgment. Defendant failed to satisfy that standard in the District Court.   The *prima facie* case was established and Plaintiff adduced sufficient evidence of pretext to allow his claim to proceed to trial.  The District Court's dismissal of Plaintiff's claims should be reversed.

### b.    *The prima facie case of discrimination*

In order to make out a *prima facie* case for discrimination, Plaintiff must show that: (1) he or she was a member of a statutorily-protected class; (2) he or she was

aggrieved by an adverse employment action; and (3) the adverse employment action occurred under circumstances giving rise to an inference of illegal discrimination. *Howard v. Blalock Elec. Serv.,* 742 F. Supp. 2d 681, 700 (W.D. Pa. 2010). "[T]he specific elements of a *prima facie* case generally depend on the facts of the particular case before the court and cannot be established on a one-size-fits-all basis. *Howard,* 742 F. Supp. 2d at 700 (internal citations omitted). Indeed, "the *prima facie* inquiry remains flexible and must be tailored to fit the specific context in which it is applied." *Id.*

In the instant case, Defendant challenged only the "inference of discrimination" prong of the *prima facie* case as to Plaintiff's race and age discrimination claims. There was no basis for this challenge, as the District Court correctly found. *See* 12a. There was sufficient evidence to satisfy the "inference of discrimination" prong of the *prima facie* case. As the Court noted, *see* 11a: "Plaintiff responds that he worked for over two decades without issue until [Angela] Rodden became his supervisor . . ." 11a; " . . . Rodden made a comment to Plaintiff, which he took to be racial in nature, stating, `Vanguard may not be the place for your type.'" 11a; "Several supervisors . . . called Plaintiff by the name of another black male in the department . . ." 11a; [a]nd Plaintiff's productivity was erroneously calculated in Vanguard's Horizon system, which his supervisors had the ability to manipulate." 11a.

17

There is no question the foregoing was sufficient evidence to establish the "inference of discrimination" prong of the prima facie case. Plaintiff asserts, however, that the District Court could have – and should have – used this same evidence to establish pretext.

### c.    *The Issue of Pretext, and What the District Court Got Wrong*

If a plaintiff establishes a *prima facie* case, as Plaintiff did here, the "burden shifts to [the defendant] to assert a legitimate, non-discriminatory reason" for the adverse employment action. *Meyers v. Hoboken Bd. of Educ.,* 2010 U.S. Dist. LEXIS 115712, 25 (D.N.J. Oct. 29, 2010). If the defense can meet this burden, the plaintiff must then "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons, or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at *12. An employment discrimination plaintiff survives summary judgment "if she can produce evidence sufficient to meaningfully throw into question the employer's reason for the allegedly discriminatory action." *Id.*

Defendant's stated reason for Plaintiff's firing was "poor performance." Plaintiff had more than ample evidence to cast doubt on this alleged explanation. Indeed, he may rely on the same evidence he utilizes to establish his *prima facie* case. *See Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir. 1989). In *Jalil,* the

Third Circuit noted that summary judgment evidence need not be "compartmentalized," and that:

> Although [a] fact is important in establishing plaintiff's *prima facie* case, ***there is nothing preventing it from also being used to rebut defendant's proferred explanation.*** As we have stated before, the *McDonnell-Douglas* formula does not compartmentalize the evidence so as to limit its use to only one phase of the case. The plaintiff's evidence might serve ***both*** to establish a *prima facie* case and discredit a defendant's explanation.

> *Jalil v. Avdel Corp., supra,* 873 F.2d 701, 708 n. 6 (3d Cir. 1989)(emphasis added, citing *Dillon v. Coles,* 746 F.2d 998, 1003 (3d Cir. 1984).

In this case, we have ample evidence of pretext. That evidence includes some of the evidence Plaintiff used to establish his *prima facie* case. The District Court erred in two respects. First, it failed to credit this evidence as sufficient to establish pretext after finding it was sufficient to make out the "inference of discrimination" prong of the *prima facie* case. Second, it erred in finding that Defendant "ruled out the likelihood" of any human intervention in Plaintiff's performance numbers as entered in the "Horizon" system, and found the corporate designee's testimony showed it was "unlikely" Rodden or Perilli sabotaged Plaintiff. 17a. Both these views of the designee's testimony were simply wrong, and unsupported by the testimony in question. In fact, the 30(b)(6) designee could not rule out human intervention – and could not explain how Plaintiff's numbers came to be so wrong. Moreover, given that no other explanation has been forthcoming for the incorrect numbers, and given the

19

admission that Plaintiff's supervisors had access to alter the entries in the system, *human intervention was far from "unlikely."* As Sir Arthur Conan Doyle teaches us (via Sherlock Holmes), "when you have eliminated the impossible, whatever remains, however improbable, must be the truth." Sir Arthur Conan Doyle, *The Sign of the Four* (1890).

First, Plaintiff worked for 26 years without a hint of performance problems. Second, he was then was subjected to no less than seven negative evaluations, warnings, or appraisals in the years 2011, 2012 and 2013 (*see* 67a, Statement of Stipulated facts, paragraphs 14-18) – *all under the tenure of Angela Rodden,* a Caucasian who served as his direct supervisor, was directly involved in the all the foregoing disciplines and appraisals, and who - on two occasions – told Plaintiff that Defendant might not be the place for "his type" (a remark he took – and any reasonable employee would take – to be a racial slur). *See* 75a-76a, paragraphs 15-21. Defendant's Crew Relations employee, Nina Matson, has confirmed that the Rodden write-ups *factored heavily* into his May 2014 firing, since that firing would not have been based on only one or two incidents, but Plaintiff's entire record. *See* 82a, paragraph 52.

Third, Plaintiff's subsequent supervisor, Anthony Perilli (who began supervising him in January 2014, *see* 78a, paragraph 27), and other managers, deliberately confused him and another African-American employee, Willie Hubert.

*See* 78a, paragraphs 29-30.  They would call Plaintiff "Willie" and call Mr. Hubert "Thom".  *Id.*  This is clear evidence of racial bias by Perilli, since it is fair to say that any reasonable manager would find nothing funny or amusing in this conduct. It bears noting, as context for the above comments, that the research department was " . . . was either all white except for [Plaintiff] or predominantly white." *See* 76a, paragraph 21. Plaintiff also observed during his time at Defendant that of the 13 people he saw fired or forced out in the research department, " . . . 11 out of those 13 were black . . .".  Most were fired due to alleged drops in productivity. *See* 76a, paragraph 23, *supra.*

Fourth, Rodden made sure to make it clear to Perilli immediately - *right out of the gate* when he replaced her as Plaintiff's manager - that Plaintiff was, in her eyes, a poor performer. Perilli testified that Rodden "introduced" Plaintiff's alleged performance issues at a "transition meeting" with her and Plaintiff before taking over as Plaintiff's supervisor.  *See* 78a-79a, paragraph 31.

Fifth, as discussed briefly *supra,* there is the documented – and still unexplained - discrepancy with the manner in which Plaintiff's productivity was being reported in the "Horizon" system in 2013 (under the supervision of both Rodden and Perilli); his hours were doubled from 7.5 to 15.  Defendant offered no explanation for this state of affairs, although a 30(b)(6) deposition was taken to attempt to obtain an explanation.  *See* 82a-83a, paragraphs 53 through 58, *supra.*

Defendant's own supervisors have admitted they had the ability to enter the system and make the changes that would have resulted in Plaintiff's hours being doubled. *See* 81a, paragraphs 48 through 50. ***No other explanation*** (other than an unidentified – but unexplained – "glitch") has been forthcoming for the long-term doubling of Plaintiff's hours. Moreover, Perilli initially *denied there was anything wrong* with the reporting of Plaintiff's productivity even after he claimed he was working with support personnel to ascertain what was wrong. In January of 2014, Perilli began coming to Plaintiff asking why his productivity numbers (reported by the Horizon system) were low, and Plaintiff began advising him the Horizon system was getting the numbers wrong. Perilli's response was "I'll look into it." Perilli initially stated "[w]e checked into it, they're accurate." *Id.* That could not have been true since Defendant's 30(b)(6) representative testified it was clear on examination that the hours were doubled. Defendant itself now concedes the hours were in fact being doubled. *See* 79a, paragraphs 34 through 36. Had Perilli truly looked into the situation with the help of support personnel, he would have known that. His statement to Plaintiff that Perilli initially stated "[w]e checked into it, they're accurate," was simply false. It is a reasonable inference that Perilli and Rodden made changes to the system, to double the hours (they admit they had the ability to do so) and made it appear Plaintiff *was half as productive as he actually was*. Perilli admits only Plaintiff's direct supervisor (*i.e.:* he or Rodden) or

someone from the support department could have done this. *See* 81a, paragraph 50. This alone, even if the other evidence set forth *supra* had not been adduced, would be enough to cast doubt on the claimed reason for the firing of Plaintiff. There is certainly sufficient evidence for a jury to conclude Rodden and Perilli caused the discrepancy deliberately due to racial animus. The District Court read too much into the foregoing testimony, finding that it "ruled out the likelihood of human intervention." 17a. It simply did not. It did not even come close to doing so. The fact is that human intervention remains the most likely explanation for the doctoring of Plaintiff's performance numbers in the "Horizon" system. Indeed, even if this evidence stood alone, it is enough to establish pretext and allow a jury to rule upon Plaintiff's claims. But taken along with Rodden's comments, the use of another African-American employee's name to describe Plaintiff, and the other evidence cited *supra,* it is all the more compelling, and certainly more than sufficient to establish pretext and to allow a jury to determine that the alleged basis for Plaintiff's firing was false, and that his race was the true reason. Defendant's motion for summary judgment should have been denied.

## VII.  <u>CONCLUSION</u>

For the reasons set forth above, the district court erred in granting summary judgment to Defendant. The Court should reverse its decision and remand this matter for trial.

Respectfully submitted,

KOLMAN ELY, P.C.

Wayne A. Ely, Esquire
414 Hulmeville Avenue
Penndel, PA 19047
(T) 215-750-3134 / (F) 215-750-3138

*Counsel for Appellant*

January 12, 2017

## CERTIFIATION OF BAR MEMBERSHIP
## PURSUANT TO THIRD CIRCUIT RULE 46.1(e)

I hereby certify that I am a member of the bar of the United States Court of

Appeals for the Third Circuit.


By:    /s/ Timothy M. Kolman, Esquire
       Timothy M. Kolman, Esquire
       Attorney for Plaintiff/Appellant
       414 Hulmeville Avenue
       Penndel, PA  19047

January 12, 2017

## CERTIFIATION OF BAR MEMBERSHIP
## PURSUANT TO THIRD CIRCUIT RULE 46.1(e)

I hereby certify that I am a member of the bar of the United States Court of

Appeals for the Third Circuit.


By:　/s/ Wayne A. Ely, Esquire
　　　Wayne A. Ely, Esquire
　　　Attorney for Plaintiff/Appellant
　　　414 Hulmeville Avenue
　　　Penndel, PA  19047

January 12, 2017

## CERTIFIATION OF BAR MEMBERSHIP
## PURSUANT TO THIRD CIRCUIT RULE 46.1(e)

I hereby certify that I am a member of the bar of the United States Court of

Appeals for the Third Circuit.


KOLMAN ELY, P.C.

/s/ W. Charles Sipio
W. Charles Sipio
Attorney for Plaintiff
414 Hulmeville Avenue
Penndel, PA 19047
(215) 750-3134


January 12, 2017

## CERTIFICATE OF COMPLIANCE
## REGARDING ELECTRONIC FILING

Pursuant to Fed.R.App.P. 32(a)(7)(B), I hereby certify that the electronic and hard copies of Appellant's Brief in the instant matter contain identical text and that a virus check was performed upon the electronic copy of the brief using Malewarebytes Anti-Maleware.

KOLMAN ELY, P.C.

By:    /s/ Wayne A. Ely, Esquire
        Wayne A. Ely, Esquire
        Attorney for Plaintiff/Appellant
        414 Hulmeville Avenue
        Penndel, PA  19047

January 12, 2017

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he served two copies of Appellant's

Brief and Appendix upon the below individual(s) by first class mail, postage

prepaid:

PAUL G. NOFER, ESQUIRE
KLEHR HARRISON HARVEY BRANZBURG LLP
1835 MARKET ST STE 1400
PHILADELPHIA, PA 19103


KOLMAN ELY, P.C.

By:    /s/ Wayne A. Ely, Esquire_____
       Wayne A. Ely, Esquire
       Attorney for Plaintiff/Appellant
       414 Hulmeville Avenue
       Penndel, PA  19047

January 12, 2017

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO FED.R.APP.P. 32(a)(7)(B)

Pursuant to Fed.R.App.P. 32(a)(7)(B), I hereby certify that the Brief of Appellant in the instant matter complies with the 14,000-word type-volume limitation of Fed.R.App.P. 32(a)(7)(b)(i) in that, based on a word-count completed on the brief before filing using the Microsoft Word word-counting function, it contains 4,845 words.

KOLMAN ELY, P.C.

By:    /s/ Wayne A. Ely, Esquire
       Wayne A. Ely, Esquire
       Attorney for Plaintiff/Appellant
       414 Hulmeville Avenue
       Penndel, PA 19047

January 12, 2017

# APPENDIX OF PLAINTIFF/APPELLANT
## TABLE OF CONTENTS

**VOLUME I**
**(Appended to Brief)**

District Court Opinion…..……………………………………………………………1a.

District Court Order Granting Defendant's Motion to for Summary Judgment……19a.

Notice of Appeal……………………………………………………………..……..20a.


**VOLUME II**

Docket Entries…………………………………..………………………..…....21a.

Plaintiff's Civil Action Complaint……………….…………….......…....…..27a.

Defendant's Answer to the Complaint……………….………………..……….....47a.

Defendant's Motion for Summary Judgment……………….…………....….……...59a.

Plaintiff's Response in Opposition re: Summary Judgment………….……….…...72a.

Defendant's Reply Brief in Support of Summary Judgment………………….…..324a.

Plaintiff's Sur-Reply in Opposition of Summary Judgment………………..….…502a.

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| THOM W. PARSON, | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 15-3942** |
| | : | |
| THE VANGUARD GROUP, | : | |
| **Defendant.** | : | |
| | : | |

## MEMORANDUM

**Tucker, C.J.**                                                                     **July 18, 2016**

Presently before the Court is Defendant The Vanguard Group's ("Vanguard's") Motion

for Summary Judgment on Plaintiff Thom Parson's claims of employment discrimination.  (Doc.

20.)  Upon consideration of the parties' submissions and for the reasons set forth herein, this

Court GRANTS Vanguard's Motion.

### I.    FACTUAL BACKGROUND

Plaintiff, an African-American, worked at Vanguard from 1987 to May 12, 2014, when

he was terminated at age fifty-one.  In the last years of his employment, Plaintiff was a Level B

Document Research Processing Associate ("Processor") in Vanguard's Client Relationship

Group.  His responsibilities included completing research requests, maintaining standards for

quality and productivity, and responding to client requests for account histories.  (Def. Mot. for

Summ. J. Ex. A, Statement of Stipulated Material Facts ¶¶ 1-5, Doc. 20-1 [hereinafter SSMF].)

The department in which Plaintiff worked was predominantly white.  (Parson Dep. 104:16–21,

Dec. 15, 2015, Docs. 23-2–23-4; Def.'s Reply Ex. P at VTP000914, Doc. 25-16.)

**1a.**

From 2010 to mid-January 2014, Plaintiff reported to Angela Rodden, a Caucasian female born in 1968. (SSMF ¶ 6.) Plaintiff received a "Fully Successful" rating on his 2010 year-end appraisal, but Rodden advised him to "[f]ocus on increasing [his] quality by paying attention to the details of the client request." (Def.'s Reply Ex. C, 2010 Appraisal at P248, Doc. 25-3 [hereinafter 2010 Appraisal].) In 2011, Plaintiff received the lower rating of "Further Development Needed" on his year-end appraisal. (SSMF ¶ 14.) The appraisal noted, "Thom, you are an experienced associate on the Research team but continue to ask questions on how something should be processed. It would be expected with your tenure and expertise that you should be able to analyze and resolve issues more independently without relying on others." (Def.'s Reply Ex. D, 2011 Appraisal at P252, Doc. 25-4 [hereinafter 2011 Appraisal].) It continued, "Thom, another area of development is your decision quality and interpreting client requests . . . [Y]ou need to demonstrate sound logic and organization when solving problems and in your decision making." (*Id.* at P253.)

Plaintiff's issues at work continued to escalate in 2012. On February 8, 2012, Plaintiff received a Written Alert for Performance, which noted that he was not meeting decision-making competencies. The Written Alert explained, among other things, that Plaintiff "continue[d] to ask questions on how something should be processed . . . [and was] not able to make quality decisions when interpreting client requests independently." (SSMF ¶ 15; Def.'s Reply Ex. E., Written Alert for Performance, Feb. 8, 2012, at VTP000214, Doc. 25-5 [hereinafter 2012 Written Alert].) A few days later, on February 14, 2012, Plaintiff received a Written Alert for Absence, Lateness, or Dependability for taking excessive unscheduled time off. (SSMF ¶ 16.) By May 14, 2012, Plaintiff had resolved the issues underlying these two Written Alerts. (Def.'s Reply Ex. F, Midyear Update, June 19, 2012, at VTP000182, Doc. 25-6.) At the end of 2012, however,

**2a.**

Plaintiff received a "Further Development Needed" on his appraisal, which cited his two Written Alerts for Performance and a time when Plaintiff did not follow proper procedures for obtaining work. Rodden noted that Plaintiff "should continue to focus on meeting department quality and productivity standards *consistently* throughout the year [and that he] continu[e] to broaden [his] knowledge in learning additional functions . . . ." (Def.'s Reply Ex. G, 2012 Appraisal at P258, Doc. 25-7.)

The relationship between Plaintiff and Rodden became increasingly tense during this time. In June 2013, Plaintiff asked to meet with Rodden to discuss time off. At the meeting, after discussing changes at the company, Rodden told Plaintiff, "Vanguard may not be the place for your type." (Parson Dep. 101:11–16.) Plaintiff felt that "type" as used by Rodden was a reference to his race. (*Id.* 104:10-13.) Rodden made another statement several meetings later, stating, "Vanguard may not be the place for you." (*Id.* 103:24–104:3.) Also, while Plaintiff reported to Rodden, supervisors began called Plaintiff "Willie", the name of Willie Hubert, another African-American employee, and Hubert was often called "Thom." (*Id.* 117:4-118:5.) One of the supervisors who called Plaintiff by the wrong name was Anthony Perilli, who later became Plaintiff's supervisor. (Parson Dep. 117:22-118:5.) These interactions with supervisors gave Plaintiff the impression that he "was being discussed." (*Id.* 117:15.)

On October 1, 2013, Plaintiff received another Written Alert for Performance, which stated that, although Plaintiff had "18 years of experience," he continued to "show inconsistencies in [his] processing," "struggle[d] to make quality decisions and continue[d] to ask many questions on how to process Research requests." (SSMF ¶ 17; Def.'s Reply Ex. H, Written Alert for Performance, Oct. 1, 2013, at VTP000246, Doc. 25-8 [hereinafter 2013 Written Alert].) The Written Alert included five competency gaps and examples thereof. It described an

3

**3a.**

incident in which Plaintiff received a client request for check images dating 2008 and prior, which should have taken about two hours to complete. Plaintiff instead completed the request by providing checks dated 2008 and later and he took over thirteen hours. (2013 Written Alert at VTP000246–47.) The Written Alert also included an incident when Plaintiff left a priority request incomplete over a weekend without notifying the requester or updating the request status when he could have completed the request by an alternative method. (*Id.* at VTP000247.) Plaintiff also "no actioned" a client request that should have been processed and another associate had to complete it. (*Id.*)

On December 6, 2013, Rodden identified seven additional instances occurring over two days when Plaintiff processed requests incorrectly and needed to reprocess them. (Def.'s Reply Ex. J, E-mail from Angela Rodden to Plaintiff (Dec. 6, 2013, 14:48 EST), Doc. 25-10.) Rodden then contacted her supervisor, Kyle Esterbrook, about issuing a Formal Warning to Plaintiff. (*Id.* Ex. K, Crew Relations Counseling Sessions, Dec. 9, 2013, at VTP000139, Doc. 25-11.) On December 13, 2013, Plaintiff received a Formal Warning for Performance based on his failure to close the competency gaps identified in the October 2013 Written Alert. The Formal Warning stated, "You continue to show inconsistencies in your processing. You struggle to make quality decisions and continue to ask many questions on how to process Research requests." (*Id.* Ex. L, Formal Warning, Dec. 13, 2013, at VTP000208, Doc. 25-12 [hereinafter Formal Warning].) The Formal Warning included three examples of competency gaps observed in the two weeks prior. (SSMF ¶ 18.) First, Plaintiff had received a priority request for a check image, but instead of processing the request right away, Plaintiff contacted the account representative to ask for fund and account numbers, resulting in delays. (Formal Warning at VTP000209.) Second, Plaintiff sent a request to the "No Action" queue when action was needed. (*Id.*) Third, Plaintiff declined

4

**4a.**

to process a request by citing a new service model, which was erroneous and resulted in inaccurate information and delayed processing. (*Id.*) Plaintiff electronically signed the Formal Warning, acknowledging his understanding that "significantly sustained improvement in the areas mentioned must be made immediately. . . . Failure to meet or maintain the required performance standards could result in further disciplinary action, up to and including termination of [his] employment." (*Id.*; SSMF ¶ 19.) At the end of 2013, Plaintiff received an appraisal rating of "Further Development Needed." (Def.'s Reply Ex. M, 2013 Appraisal, at VTP000200, Doc. 25-13.)

In mid-January 2014, Plaintiff's supervisor changed from Rodden to Anthony Perilli, a Caucasian male born in 1967. (SSMF ¶ 7.) Rodden, Perilli and Plaintiff met for a transition meeting during which Rodden discussed Plaintiff's work performance. (Perilli Dep. 17:14–18:8, Jan. 8, 2016, Doc. 23-7.) After Perilli took on his role as supervisor, he asked Plaintiff why Plaintiff's productivity numbers as reported by Vanguard's Horizon system were low. Plaintiff responded that the Horizon system was inaccurate. (Parson Dep. 247:18–22.) Horizon, a Vanguard reporting system, measured productivity as a ratio between the "functions that an associate performed" as a numerator and the "hours that [the associate is] held accountable for" as the denominator. (Kerlin Dep. 18:8–18, Mar. 2, 2016, Doc. 23-10.) Perilli contacted Horizon support personnel to investigate the issue. He then discovered that the system incorrectly doubled Plaintiff's work hours from 7.5 to 15, which inflated the denominator in Plaintiff's productivity ratio and resulted in lower productivity numbers. (Perilli Dep. 23:13–24, 26:15–25.) During the time when Plaintiff's productivity numbers were wrongly reported, Rodden and then Perilli had supervisory access to Horizon. (Rodden Dep. 9:2–8, 12:13–19, Jan. 8, 2016, Doc. 23-8; Perilli Dep. 29:7–20, 38:4–25; Kerlin Dep. 28:24–29:1.) Ultimately, neither Perilli

**5a.**

nor the Horizon support team was able to identify the source of the error. (Perilli Dep. 24:11–12;

Kerlin Dep. 31:4–5, 39:6–7.) Perilli, however, assured Plaintiff that his productivity numbers in

Horizon would not count against Plaintiff's performance. (Perilli Dep. 23:22–24, 31:1–4.)

The Formal Warning from December 2013 was effective until March 13, 2014, but

because Plaintiff was on leave for a part of this time, Vanguard extended the warning period to

April 9, 2014. (SSMF ¶ 21.) On April 9, 2014, Perilli advised Nina Mattson-Thomas, a Crew

Relations Specialist in Vanguard's Human Resources department, that Plaintiff had additional

"fall out items" since being placed on the Formal Warning. (*Id.* ¶ 22.) For example, Plaintiff

had failed to monitor the research hotline as assigned, which resulted in twenty-six missed calls

and five employees being reassigned to handle the calls. (*Id.*) As a result, on May 12, 2014,

Mattson-Thomas and Perilli met with Plaintiff and terminated him. (*Id.* ¶ 23.)

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, courts shall grant summary judgment in favor

of the moving party "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." A fact is "material" if it is "one that

might 'affect the outcome of the suit under governing law.'" *Smith v. Johnson & Johnson*, 593

F.3d 280, 284 (3d Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)). A dispute as to a material fact is "genuine" if it "is one that 'may reasonably be

resolved in favor of either party.'" *Lomando v. United States*, 667 F.3d 363, 371 (3d Cir. 2011)

(quoting *Anderson*, 477 U.S. at 250).

The movant has the initial "burden of identifying specific portions of the record that

establish the absence of a genuine issue of material fact." *Santini v. Fuentes*, 795 F.3d 410, 416

(3d Cir. 2015). "Where the defendant is the moving party, the burden is on the defendant to

**6a.**

show that the plaintiff has failed to establish one or more essential elements of her case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). If the movant sustains its initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and 'come forward with specific facts showing that there is a *genuine issue for trial.*'" *Santini*, 795 F.3d at 416 (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). When assessing the motion for summary judgment, the court "must construe all evidence in the light most favorable to the nonmoving party." *Id.* Nonetheless, the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## III.   DISCUSSION

Vanguard moves for summary judgment on Plaintiff's claims, arising under various statutes, of discriminatory termination based on his age and race.[1] The Age Discrimination in Employment Act of 1967 ("ADEA") prohibits employers from "fail[ing] or refus[ing] to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]" 29 U.S.C. § 623(a). Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits employers from similarly discriminating based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). The Pennsylvania Human Relations Act ("PHRA") mirrors the ADEA and Title VII by prohibiting adverse employment actions based on age and race. 43 Pa. Cons. Stat. § 955. 42 U.S.C. § 1981 also combats racial discrimination by "protect[ing] the equal right of '[a]ll persons within the jurisdiction of the United States' to 'make and enforce contracts'

---

[1] Plaintiff has chosen not to proceed on his hostile environment and retaliation claims. Pl.'s Resp. to Def.'s Mot. for Summ. J. 14 n.2, Doc. 23.

7

**7a.**

without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474–75 (2006)

(quoting 42 U.S.C. § 1981(a)).

For disparate treatment claims arising under the ADEA, Title VII, the PHRA, and Section

1981, when evidence of discrimination is circumstantial, the court is to apply the burden-shifting

framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See Burton*,

707 F.3d at 425–26 (applying *McDonnell Douglas* in an ADEA and Title VII case based on

indirect evidence); *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 409 (3d Cir. 1999) (applying

*McDonnell Douglas* to a plaintiff's disparate treatment race discrimination claims under Title

VII, Section 1981, and the PHRA); *see also Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 213

(3d Cir. 2015) ("Claims brought under the [PHRA] are generally interpreted coextensively with

Title VII claims." (internal quotation marks omitted)); *Anderson v. Wachovia Mortg. Corp.*, 621

F.3d 261, 267 (3d Cir. 2010) ("We have previously applied the tests used to evaluate

employment discrimination claims brought under Title VII . . . to employment discrimination

claims brought under § 1981, since 'the substantive elements of a claim under section 1981 are

generally identical to the elements of an employment discrimination claim under Title VII.'"

(quoting *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181–82 (3d Cir. 2009)).

The first step in the *McDonnell Douglas* analysis is for the plaintiff to make a prima facie

case of employment discrimination. *Burton*, 707 F.3d at 426. At summary judgment, "'the

evidence must be sufficient to convince a reasonable factfinder to find all of the elements of [the]

prima facie case.'" *Id.* (quoting *Duffy v. Paper Magic Grp.*, 265 F.3d 163, 167 (3d Cir. 2001)).

The plaintiff makes a prima facie case of age discrimination by showing that: "(1) [he] is forty

years of age or older; (2) the defendant took an adverse employment action against [him]; (3)

[he] was qualified for the position in question; and (4) [he] was ultimately replaced by another

8

**8a.**

employee who was sufficiently younger to support an inference of discriminatory animus." *Id.*
To make a prima facie case of discrimination based on race, the plaintiff must show that: "(1)
[he] is a member of a protected class; (2) [he] was qualified for the position he sought to attain or
retain; (3) [he] suffered an adverse employment action; and (4) the action occurred under
circumstances that could give rise to an inference of intentional discrimination." *Makky v.
Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

      If the plaintiff makes a prima facie case, the burden of production shifts to the defendant
employer to provide a legitimate, non-discriminatory reason for the adverse action. *Burton*, 707
F.3d at 426.  This "relatively light" burden "is satisfied if the employer provides evidence,
which, if true, would permit a conclusion that it took the adverse employment action for a non-
discriminatory reason." *Id.*  The defendant does not, however, need to prove that the proferred
reason actually motivated its conduct. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248,
254 (1981).

      If the defendant carries its burden of providing a legitimate non-discriminatory reason for
its conduct, the burden of production shifts back to the plaintiff to demonstrate that the proffered
reason is pretextual. *Burton*, 707 F.3d at 426.  "To make a showing of pretext, 'the plaintiff must
point to some evidence, direct or circumstantial, from which a factfinder could reasonably either
(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious
discriminatory reason was more likely than not a motivating or determinative cause of the
employer's action.'" *Id.* at 427 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).
"[I]f the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered
reasons, to survive summary judgment the plaintiff need not also come forward with additional
evidence of discrimination beyond his or her prima facie case." *Fuentes*, 32 F.3d at 764.

**9a.**

Therefore, the plaintiff need not present direct evidence of discriminatory animus to show pretext and survive summary judgment. *Burton*, 707 F.3d at 427.

### A. Vanguard is Entitled to Summary Judgment on Plaintiff's Age Discrimination Claims

The Court first addresses Vanguard's motion for summary judgment on Plaintiff's age discrimination claims. The parties do not dispute the first three elements of Plaintiff's prima facie case, namely, that Plaintiff is over 40 years old, Vanguard terminated his employment, and Plaintiff was qualified to be a Processor. (*See* Def.'s Mot. for Summ. J. 3.) Vanguard focuses on the fourth element, arguing that Plaintiff lacks sufficient evidence to support an inference of intentional age discrimination. This Court agrees. Plaintiff's briefing fails to point to any specific fact to suggest that Vanguard terminated Plaintiff because of his age. Indeed, the Court's review of the record uncovers little to support any inference of age discrimination.[2]

---

[2] At Plaintiff's deposition, Vanguard's counsel questioned Plaintiff about whether he heard comments from Angela Rodden, Anthony Perilli, or Nina Mattson-Thomas to suggest a bias against individuals based on their age. Plaintiff answered in the negative. (Parson Dep. 123:11–125:18 (Rodden), 125:19–126:3 (Perilli), 128:3–129:19 (Mattson-Thomas)). In answering these questions, Plaintiff kept referring not to age bias, but to racial bias:

Q: Did anyone ever tell you that they had heard Angela Rodden say something that suggested a bias by her against people because of their age?

A: Well, the only other people that would have had something to say were whites on the staff. So I don't think it would have been anything to concern them and I wouldn't see why she would have brought anything up to them either. . . .

Q: Did anyone ever tell you they heard Nina Matson-Thomas [sic] say something that suggested she had a bias against people because of their age?

A: Conversations about Nina would be, since Nina is black, that she should be ashamed of herself because she seems to have no problem in effect helping Vanguard with the removal of the blacks.

(*Id.* 124:13–22, 128:10–19.)

In later testimony, Plaintiff stated that age may have been a factor for Perilli's conduct, but he again turns to race:

Q: Now, with Tony Perilli, did you think that he had a bias against you because of your age?

A: I would not doubt for one second that age—that age would have come into play, and that's another case it was always hard to understand who was being forced out, you know, the first three blacks that I mentioned before, yet we worked in a department where there were three gentlemen that were the age of 60 years old. Well, two were 60. One was possibly 59. And they—they went through their day with enjoyment. . . .

Q: And what are you saying about those three people?

A: I'm just saying that those were three white individuals that never seemed to have any issues, never seemed to have any problems. When [three African-American employees] were pushed out, it was like, oh, they're getting rid of them because they're the oldest ones.

Plaintiff has therefore failed to present a prima facie case of discrimination and Vanguard is

entitled to summary judgment on Plaintiff's ADEA and PHRA age discrimination claims.

**B. Vanguard is Entitled to Summary Judgment on Plaintiff's Race Discrimination Claims**

The Court next addresses Vanguard's motion for summary judgment on Plaintiff's race

discrimination claims. Again, Vanguard does not dispute the first three elements of Plaintiff's

prima facie case. It argues, however, that Plaintiff provides no evidence to support an inference

of racial discrimination. Plaintiff responds that he worked for over two decades without issue

until Rodden became his supervisor, which is when his performance problems began. (*Compare*

2010 Appraisal at P248 (noting a rating of "Fully Successful"), *with* 2011 Appraisal at P253

(noting a rating of "Further Development Needed").) Rodden made a comment to Plaintiff,

which he took to be racial in nature, stating, "Vanguard may not be the place for your type."

(Parson Dep. 101:11–16.) Several supervisors, including Perilli, called Plaintiff by the name of

another black male in the department. (Parson Dep. 117:4–118:5.) And Plaintiff's productivity

was erroneously calculated in Vanguard's Horizon system, which his supervisors had the ability

to manipulate. (Perilli Dep. 29:7–20; Rodden Dep. 9:2–8, 12:13–19; Kerlin Dep. 28:24-29:1.)

Together, Plaintiff argues, these facts support an inference of racial discrimination by supervisors

at Vanguard. The Court agrees that Plaintiff's performance began to decline only under

Rodden's supervision, who had commented on Plaintiff's "type." Construing the evidence in the

light most favorable to Plaintiff, the Court also finds that supervisors calling Plaintiff the wrong

name and erroneous reporting in Horizon could give rise to an inference of discrimination. *See*

*Burdine*, 450 U.S. at 254 ("[T]he prima facie case raises an inference of discrimination only

because we presume these acts, if otherwise unexplained, are more likely than not based on the

---

(*Id.* 265:14–266:24.) Upon consideration of Plaintiff's testimony and the record of this case, the Court fails
to find specific facts upon which to infer that Vanguard terminated Plaintiff because of his age.

**11a.**

consideration of impermissible factors." (internal quotation marks omitted)).    Accordingly, the

Court finds that Plaintiff has presented sufficient evidence to establish a prima facie case of race

discrimination.    *See id.* at 253 ("The burden of establishing a prima facie case of disparate

treatment is not onerous.")

      The burden of production now shifting to Vanguard, Vanguard articulates that its

legitimate, non-discriminatory reason for Plaintiff's termination was his "continued poor quality

of work." (Def.'s Reply in Supp. of Mot. for Summ. J. 21, Doc. 25.)    Vanguard points to

Plaintiff's poor year-end appraisals for 2011, 2012, and 2013 and his receipt of two Written

Alerts and a Formal Warning.    Underlying these disciplinary actions was Plaintiff's "failure to

demonstrate sound judgment, failure to expand his job knowledge to allow him to work

independently, and failure to learn from his own experience."    (*Id.*)    The record supports

Vanguard's contentions.    (*See* 2011 Appraisal at P252 ("Thom, you are an experienced associate

on the Research team but continue to ask questions on how something should be processed.");

2012 Written Alert at VTP000214 ("Thom, you . . . continue to ask questions on how something

should be processed.    You are not able to make quality decisions when interpreting client

requests independently."); 2013 Written Alert at VTP000246 ("You struggle to make quality

decisions and continue to ask many questions . . . . Does not demonstrate sound judgement [sic]

in making decisions on how to process requests . . . . Does not take responsibility to learn and

improve."); Formal Warning at VTP000208 ("You struggle to make quality decisions and

continue to ask many questions on how to process Research requests."); Def.'s Reply Ex. Q,

Crew Relations Counseling Sessions, May 12, 2014, at VTP000160, Doc. 25-17 (noting

"Thom's separation from VG [Vanguard] due to unsatisfactory performance")).    The Court

**12a.**

therefore finds that Vanguard presents sufficient evidence to support a legitimate, non-discriminatory reason for Plaintiff's termination.

Plaintiff now bears the burden of showing that Vanguard's articulated legitimate reason—his deficient work performance—was pretextual. As discussed, Plaintiff may make this showing in one of two ways by identifying evidence from which a factfinder could reasonably either (1) disbelieve Vanguard's preferred justification, or (2) believe that racial animus was more likely than not a motivating or determinative cause of Plaintiff's termination. *Burton*, 707 F.3d at 427. If a plaintiff attacks the credibility of an employer's articulated legitimate reasons for its action, his evidence "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's preferred legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes*, 32 F.3d at 765 (internal quotation marks and citation omitted). To make this showing, Plaintiff here relies on the same evidence upon which he based his prima facie case of race discrimination.

This Court concludes that Plaintiff has not carried his burden of demonstrating pretext. First, Plaintiff cites his work history prior to Rodden's supervision, during which Plaintiff never received any discipline. This, however, neither contradicts Vanguard's contention that Plaintiff's performance declined in the last years of his employment nor is probative of discrimination. *See Kautz v. Met-Pro Corp.*, 412 F.3d 463, 474 (3d Cir. 2005) ("The attempt to use past positive performance reviews to show that more recent criticism was pretextual fails as a matter of law.") Plaintiff himself admits that his performance at the end of his employment changed: "I said it was like tripping at the finish line[,] there were a few mistakes that were made," and "there probably was a mistake or two, but I had been doing so well and as I said, I tripped right in front

13

**13a.**

of the finish lane [sic]." (Parson Dep. 280:14–16, 282:3–7.)  For example, Plaintiff admits that

he failed to monitor the research hotline on his assigned day, which was one of the infractions

resulting in his termination.  (SMF ¶ 22; Parson Dep. 299:9–16.)

Second, Plaintiff states that his negative appraisals, Written Alerts, and Formal Warning

occurred under the supervision of Rodden, a Caucasian supervisor, who commented that

Vanguard may not be the place for Plaintiff's "type."  Plaintiff implies that Rodden targeted her

criticism at him because of his race and it was her negative evaluations that resulted in his

eventual termination.  The evidence, however, does not show how discriminatory animus was

part of the decision-making process surrounding his termination.  Rodden did not have any hand

in the decision to terminate Plaintiff.  Rodden's comment about Plaintiff's "type," made

approximately eleven months prior to his termination, is unrelated to the termination decision

and best characterized as a "stray remark," which does not bear great weight in a pretext

analysis. *Kargbo v. Phila. Corp. for Aging*, 16 F. Supp. 3d 512, 528 (E.D. Pa. 2014) (quoting

*Hook v. Ernst & Young*, 28 F.3d 366, 375 (3d Cir. 1994)) (defining "stray remarks" as

"[s]tatements divorced from the employment decision" and noting how stray remarks "can be

considered as part of the evidence of pretext, but alone are insufficient to show racial animus").

Stray remarks, in combination with evidence to discredit an employer's legitimate non-

discriminatory reason, may support a showing of pretext. *Id.*  As this Court will continue to

discuss, however, Plaintiff has not provided sufficient evidence to disbelieve that Vanguard

terminated him because of his poor performance.

Third, Plaintiff presents evidence that Perilli and other supervisors called him by the

name of another black male employee, Willie Hubert, arguing, "This is clear evidence of racial

bias by Pirelli [sic]." (Pl.'s Resp. at 17, Doc. 23.)  The Court, however, is not convinced.

14

**14a.**

Plaintiff's testimony describes these incidents as mistaken identifications rather than examples of

racial bias.[3] This evidence is therefore insufficient to allow a disbelief that Perilli terminated

Plaintiff for his performance or to show that racial discrimination was more likely than not a

determinative cause of Plaintiff's firing.  Plaintiff also points to his observations that Vanguard

"fired or forced out" thirteen employees from his department and eleven, including him, were

African-American.  (*Id.*)  It is true that "statistics as to [a defendant's] employment policy and

practice may be helpful to a determination of whether [a defendant's action] conformed to a

general pattern of discrimination against blacks." *McDonnell Douglas Corp.*, 411 U.S. at 805.

Without more information about whether these former Vanguard employees were adequately

qualified for their positions, however, this Court cannot conclude that Plaintiff's observations are

probative of discrimination.[4] *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509,

---

[3] Plaintiff's testimony included the following:

A:  There are a host of other supervisors on the other side that just didn't know me.  After Supervisor Rodden arrived, I just started to notice more of them started to speak to me and say hello to me and, you know, I just thought it was odd at first and then it got to the point where—they weren't calling me Thom.  They were calling me Willie.  And honestly, it was every one of them.  And then they would see Willie and they would call him Thom.
So the mindset was that why does everybody know us all of a sudden, you know, why are they speaking to us, and it just kind of started to give me the mindset that I was being discussed. . . .
I hadn't known Tony Perilli at this point either.  Tony was calling me Willie, calling Willie Thom. . . .
I—it annoyed me.  I thought it was disrespectful.
Q:  Okay.  You thought it was disrespectful that they were calling you by the wrong name?
A:  They were calling me—yeah.  To me we look completely different and I resented it and Willie would just laugh and laugh . . . That's just something that annoyed me, that's all, but with that it made me believe—again, these were not people that spoke to me before Angela Rodden arrived. . . .
Q:  [W]hen these individuals called you by the wrong name, did you ever correct them and tell them your correct name?
A:  Normally—I don't think I did.
Q:  Okay.  Why not?
A:  There's something that was—in me that was like, well, I don't want them to look foolish.  So I just said hi and just— my mindset was that we looked nothing alike.
(Parson Dep. 116:22–121:8.)

[4] Further, regarding the circumstances surrounding the departure of ten other black employees, Plaintiff's evidence is either speculative or based on hearsay.  Two of the employees had spoken directly with Plaintiff about their decision to retire after their supervisors harassed and/or threatened them regarding their competency.  (Parson

15

**15a.**

542–43 (3d Cir. 1992) (rejecting a plaintiff's "raw numerical comparisons" to support pretext

when they "are not accompanied by any analysis of either the qualified applicant pool or the flow

of qualified candidates over a relevant time period").

Fourth, Plaintiff points out how Rodden "made sure to make it clear to Pirelli *right out of

the gate* when he replaced her as Plaintiff's manager that Plaintiff was—in her eyes—a poor

performer." (Pl.'s Resp. at 17.)  Plaintiff relies on Perilli's testimony:

> Q: And when did you first begin perceiving that there may be a performance
>    problem with Thom?
> A: That was introduced to me when Thom, myself and Angela first met.
> Q: And how did that occur?
> A: That was our transition meeting. . . .
> Q: To the best of your ability, can you relate to me what was discussed about it? .
>    . .
> A: Angela presented me with what was written on the formal warning, that
>    Thom—had been issued to Thom.   I don't recall the specifics of the
>    situation—the situations, but I know there were seven/eight, maybe, incidents
>    that were documented in that document.

(Perilli Dep. 17:14–18:8.)  This evidence, however, does not show pretext.  It neither

demonstrates racial animus nor discredits Vanguard's legitimate, non-discriminatory reason for

terminating Plaintiff.  Rather, Rodden's conduct during her transition with Perilli concerned

Plaintiff's work performance, which is a legitimate ground for their meeting and supports

Vanguard's assertion that Plaintiff's termination resulted from performance issues.

Fifth, Plaintiff refers to the erroneous reporting of Plaintiff's productivity in the Horizon

system as evidence of pretext.  Plaintiff asserts that Rodden and Perilli had supervisory access to

Horizon such that they could improperly lower Plaintiff's reported productivity.  Plaintiff's

conclusion is that, because Rodden and Perilli could have altered his productivity numbers, they

---

Dep. 139:22–142:20; Def.'s Reply Ex. W at 10.) Another had discussed taking an early retirement because he was
"made to be so miserable[.]" (Parson Dep. 152:11.) Plaintiff attended the retirement party of two others. (*Id.*
155:7–18, 155:16–21, 157:2–14.) Three departed without explanation. (*Id.* 154:1–5, 158: 11–17, 172:16–22.) And
Plaintiff learned of the termination of two others through coworkers. (*Id.* 146:8–11, 171:10–15.)

**16a.**

did so to create false grounds for termination. Plaintiff's position, however, is speculative and not supported by the record. Testimony provided by Michael Kerlin, a member of the Horizon support team, shows that it is unlikely that Rodden or Perilli sabotaged Plaintiff's productivity numbers. Kerlin attempted to replicate the error manually by doubling an associate's work hours, but was unable to. (Kerlin Dep. 29:4–23.) He found no evidence that Perilli had doubled Plaintiff's work hours in Horizon and ruled out the likelihood that any human intervention caused the error. (Kerlin Dep. 49:25–50:18, 29:2–23.) Further, Plaintiff provides no evidence that his incorrect productivity numbers contributed to his termination. (*See* Parson Dep. 254:4–7, 257:19–258:1 ("Q: Did there come a time when Tony told you that the Horizon numbers are off the table? A: Yes."); Perilli Dep. 23:22–24.) Indeed, his termination rested primarily on the inconsistent quality of Plaintiff's work and his failure to use sound judgment. (*See* Def.'s Reply Ex. P, Request for Termination, Doc. 25-16.) Even if Plaintiff had strong productivity numbers, it does not contradict Vanguard's assertion that his termination was for performance since one can be productive without producing quality work.

   Upon consideration of Plaintiff's evidence purporting to show that Vanguard's legitimate non-discriminatory reason for termination was pretextual, this Court does not find it sufficient to defeat summary judgment. Based on the evidence, a factfinder cannot reasonably conclude that Vanguard's articulated justification was unworthy of credence or that discriminatory animus was more likely than not a motivating factor in Plaintiff's termination. Accordingly, Vanguard is entitled to summary judgment on Plaintiff's race discrimination claims under Title VII, the PHRA, and Section 1981.

**17a.**

IV.    **CONCLUSION**

For the reasons set forth herein, the Court concludes that Plaintiff has failed to present specific facts to show there is a genuine issue for trial and Vanguard's motion for summary judgment is GRANTED.

**18a.**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **THOM W. PARSON,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 15-3942** |
| | : | |
| **THE VANGUARD GROUP,** | : | |
| **Defendant.** | : | |
| | : | |

### <u>ORDER</u>

**AND NOW**, this _18th_ day of July, 2016, upon consideration of Defendant's Motion for Summary Judgment (Doc. 20), Plaintiff's Response in Opposition (Doc. 23), Defendant's Reply (Doc. 25), and Plaintiff's Sur-Reply (Doc. 28), **IT IS HEREBY ORDERED AND DECREED** that Defendant's Motion is **GRANTED** and **JUDGMENT** is **ENTERED** in favor of Defendant and against Plaintiff on all counts of the Complaint.

BY THE COURT:

**/s/ Petrese B. Tucker**

_____
**Hon. Petrese B. Tucker, U.S.C.J.**

**19a.**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

THOM PARSON

       *Plaintiff,*

       vs.

THE VANGUARD GROUP

       *Defendant.*

NO. 15-3942

CIVIL ACTION

**NOTICE OF APPEAL**

    Plaintiff hereby appeals the Court's Order granting Defendant's Motion for Summary Judgment in this matter (Docket Items 31 & 32). See Attached Exhibit 1.

                KOLMAN ELY, P.C.

                Wayne A. Ely
                KOLMAN ELY, P.C.
                414 Hulmeville Avenue
                Penndel, PA  19047

August 16, 2016

**20a.**